SEATON RANCH CO., RESPONDENT, v. MONTANA VEGETABLE OIL & FEED CO., APPELLANT.

No. 9087.
Submitted November 17, 1952.   Decided December 31, 1952.
Rehearing denied February 11, 1953
252 Pac. (2d) 1040.

416

Messrs. Church & Harris, Great Falls, Mr. William M. Maxfield, San Francisco, Cal., for appellant.

Mr. Charles Davidson, Great Falls, for respondent.

Mr. Leo C. Graybill, Great Falls, amicus curiae.

Mr. Maxfield and Mr. Davidson argued orally.

MR. JUSTICE ANGSTMAN:

This action is to recover damages alleged to have been sustained by plaintiff as a result of the death of certain sheep from eating oil cake pellets manufactured by defendant from grain and mustard seed screenings and sold to plaintiff.

This is the second trial of the case. The jury found for plaintiff in the first trial and for error in the giving of certain instructions the case was remanded for a new trial. Seaton Ranch Co. v. Montana Vegetable Oil & Feed Co., 123 Mont. 396, 217 Pac. (2d) 549. In the second trial the jury again found for plaintiff in the sum of $8,408.82. Defendant's motion for a new trial was denied and it has appealed from the judgment entered on the verdict.

The evidence introduced at the second trial was substantially the same as that introduced at the first trial. We shall not recite the facts which are alluded to in the opinion on the first appeal but shall only comment upon that portion of the evidence which is claimed to be different from that introduced at the first trial, and which it is contended affects questions presented.

Defendant contends that the evidence was insufficient to warrant a finding that there had been a sale of the pellets by defendant to plaintiff and hence that it was improper to give instructions based on R. C. M. 1947, sec. 74-321, which reads: "One who makes a business of selling provisions for domestic use warrants, by sale thereof, to one who buys for actual consumption, that they are sound and wholesome."

This same question was presented on the first appeal and we

held the evidence was sufficient to make the question one for the jury. Defendant contends that the evidence in the second trial on this point was not the same as that at the first trial. We see no substantial difference in the evidence offered by plaintiff on this point at the second trial from that upon which the decision on the first appeal was based.

Mr. Seaton, president of plaintiff corporation, testified in this case as follows:

"Q. And what was your conversation with Mr. Simpson? A. It was relative to the price of this other feed, and he said that—as I remember it now—that he didn't know the exact protein content of the feed, but the price would be based on the protein content of that feed as compared to the linseed pellets.

"Q. Did he say whether or not the protein content of that new feed might be greater or less than the linseed? A. I think he said it would probably be less.

"Q. And the price would be based proportionately? A. According to the percentage of protein. * * *

"Q. Was it your understanding after that conversation that if this feed would be eaten by the sheep that you were to pay for the same? A. If the sheep would have eaten that feed, if it had been satisfactory, I expected to buy forty or fifty tons of it, probably.

"Q. This particular twenty sacks, is it your understanding if it was palatable food and the sheep ate it that you would be billed for it at the price which was then undetermined? A. I believe it was."

Again with reference to the same conversation Mr. Seaton testified further:

"Q. In that conversation was there anything said by either one as to whether or not you were to pay for those twenty sacks of pellets if they proved palatable? * * * A. I can't remember whether we talked about any particular pellets. It was the whole deal. If they were palatable I was going to pay for them and I expected to buy more if they were palatable.

"Q. Were you expecting to pay for these twenty sacks if they proved palatable? A. Well, I fully expected to."

It was this evidence which we held sufficient to make out a prima facie case of sale on the first appeal. That decision, which was unanimous on that point, became the law of the case binding upon the parties and the district court. State ex rel. Great Northern Ry. v. State Board of Equalization, 126 Mont. 187, 246 Pac. (2d) 220.

Defendant contends that there is no evidence showing negligence on the part of defendant. The record shows that before feeding the pellets in question here plaintiff fed its sheep linseed pellets. Defendant, being unable to supply plaintiff with all of the linseed pellets which it desired, gave plaintiff one sack of the kind of pellets involved here, but the sheep would not eat it after having the normal feeding of linseed pellets and this fact was reported to defendant. Defendant thereupon suggested that plaintiff take a ton of the pellets in question and feed nothing else to the sheep. This was done. Plaintiff instructed its herder to give the sheep 500 pounds of mustard screening pellets one morning and grain screening pellets the next morning. The result was the death of the sheep alleged in the complaint. When plaintiff noticed the death of some of its sheep, it called veterinarian Dr. Fisher of Great Falls who examined the dead sheep and took samples which were sent to the laboratory at the Bozeman State College. He noticed that the sheep's stomachs were inflamed.

Plaintiff took samples of the pellets and two live sheep to Dr. Joneschild of the state livestock commission laboratory at Helena. Dr. Joneschild fed the pellets to the sheep with forceps in the evening and found them dead the next morning. He notified the state laboratory at Bozeman and delivered the remaining pellets to Dr. Marsh, a member of the staff of the veterinary research laboratory at Bozeman. Dr. Marsh and Dr. Schwingel conducted experiments with the pellets and their effect on the sheep. They fed some to sheep through a tube and the sheep died. Dr. Marsh testified:

"Q. From your examination of those sheep, the method of feeding them, the material they were fed, the symptoms which you noticed prior to the death of these two sheep, and your post mortem examination and findings, were you able to conclude as to what caused the death of these two sheep? A. Yes.

"Q. And what did cause the death of the two sheep? A. The pellets which we administered to them were the cause of the death of the sheep."

He further said: "They evidently died as a result of an irritant poison." He found a severe inflammation of the lining of the fourth stomach and the intestines and explained that it was much different from the condition which would be present if the sheep died from overeating which defendant contends was the cause of the death of the sheep. He further testified that the feeding of two pounds of pellets to the one sheep and one pound to the other was not sufficient to constitute overeating; that the feeding of 500 pounds to 2400 sheep on winter range would not be excessive feeding; and he said, "The feeding of two pounds as we did in those cases would not cause the death of a sheep, of an ordinary concentrate." Dr. Marsh described the poison, which killed the sheep, as volatile oil of mustard. He said that there was seven times as much volatile oil of mustard in the rumen contents as was contained in the pellets fed to the sheep.

There was evidence that in the manufacturing process bland oil is removed from the seeds. In addition to the bland oil, the seeds contain glucoside. Dr. Schwingel testified that glucoside is a combination of three items held together chemically; that the seeds also contain a reactive agent called enzyme myrosin. He said that when the seed is crushed and moisture added the reacting agent, myrosin, attacks the glucoside and splits it into three parts, sugar, salt and volatile oil of mustard. He said that from the tests made by him with black mustard he determined that the heat alone applied in the manufacturing process would not inactivate this enzyme myrosin; that it required a combination of heat and moisture. His conclusion was

that the results obtained from tests with black mustard would present the same conditions in enzymes in the mustard seeds involved in this case.

Defendant's witness Weinberg testified that if volatile oil of mustard and bland oil are introduced into a sheep's rumen, the volatile oil of mustard would be dissolved by the bland oil. Plaintiff's witness Kropp testified that he had been feeding his sheep whole grain and mustard screenings for about 15 years. He met Mr. Simpson, the president of the defendant company, at the Rainbow Hotel in Great Falls and Mr. Simpson asked him to try out mustard pellets which defendant was putting out. Kropp agreed to do so and they were sent to him but shortly after receiving the pellets he said he received a letter from Mr. Simpson telling him "not to feed the feed because he understood there was some sheep being lost with it." Kropp said he left the pellets in the granary until spring and then decided to try them on his sheep. He fed about 10 pounds of the pellets to 125 head of sheep in the evening. About one-half or a little less of the sheep ate the pellets. The next morning three were dead and two more sick.

After sustaining the loss of the sheep in question here plaintiff tried out the pellets on four sheep—feeding them individually, giving them each a quarter or a third of a pound and making it impossible for one sheep to get more than its allotted share of the pellets. Only one sheep ate of the pellets and it was dead the next morning.

There was evidence that plaintiff never fed this type of feed before and there was nothing in its appearance to suggest danger in its use as feed. Defendant gave no warning to plaintiff of any danger in feeding the pellets to the sheep. Defendant admitted that it made no tests or experiments with this type of feed and that no examination of books or authorities had been made to ascertain whether it was dangerous to feed it to sheep. There was some evidence by defendant that similar feed had been tested in California and that it had not been declared

poisonous. But whether the manufacturing process of that feed was the same as that used by defendant, the record does not show.

Defendant instructed plaintiff to feed its sheep nothing else in the way of concentrates. The evidence offered by plaintiff of which the foregoing is but a brief resume, constituted a sufficient showing of negligence on the part of defendant to make the question one for the jury. We keep in mind in reaching this conclusion that the precise cause of the death of the sheep, like any other fact, may be shown by circumstantial evidence.

Some cases take the view that proof of the fact of eating the food and the resulting illness or death is *per se* evidence of negligence on the part of the person preparing the same, while others take the contrary view. 22 Am. Jur., Foods, sec. 115, p. 900. We need not in this case determine which rule to follow, for here we have proof of a want of ordinary care on the part of defendant, aside from the fact of the eating of the food manufactured by defendant and the death of the sheep.

''Where recovery may be had either on the theory of negligence or on the theory of an implied warranty, the plaintiff may ground his action on either theory or on both, and it has been held that the court should not require plaintiff to elect whether to proceed in tort or on the implied warranty. Indeed, it has been said that whether such an action is called one of warranty or of negligence it comes to the same thing; it sounds in tort; and it is immaterial on which theory the action rests where the evidence is sufficient to justify a recovery on either theory. It is likewise immaterial whether the foundation of an action for injuries occasioned by unwholesome or unfit food is laid in negligence or warranty, where the liability of defendant arise from his violation of a food statute. The rule that where there is a positive duty created by implication of law independent of contract, although arising out of a relation or state of facts created by contract, an action on the case as for a tort will lie for violation or disregard of that duty, has been applied in actions for injuries caused by unfit or unwholesome food.'' 36 C. J. S., Foods, sec. 66, p. 1111.

And: "The definitions of food adopted by the statutes and cited by the courts include foodstuffs used for feed for animals. The principles of law governing the validity of regulations of food products used for the feeding of animals are, in general, the same as those governing the regulations relating to food in general * * *" 22 Am. Jur., Food, sec. 120, p. 904. And compare Seaton Ranch Co. v. Montana Vegetable Oil & Feed Co., supra; Kelley v. John R. Daily Co., 56 Mont. 63, 181 Pac. 326; and Bolitho v. Safeway Stores, Inc., 109 Mont. 213, 95 Pac. (2d) 443.

It is true as defendant points out that in the Kelley and Bolitho Cases there was proof of a foreign substance in the food. This circumstance is unimportant. The controlling fact is that there was sufficient evidence to justify submission of the question to the jury as to whether the food was sound and wholesome and fit for actual consumption by the sheep and whether in supplying it to plaintiff under the circumstances here shown defendant used ordinary care.

Defendant contends that plaintiff's loss was due to its own negligence and want of care in that it continued feeding the pellets after knowing that some of the sheep had died from the first feeding. This too was a question for the jury. Plaintiff presented proof that it did not know that the first feeding of the pellets was the cause of the death of the first sheep that died. Mr. Seaton testified that he supposed at first that it was chokecherry leaves that caused the death of the sheep. He did not learn of the cause until after the second feeding of the pellets and until after the sheep referred to in the complaint had died.

Defendant also argued that the proof shows that the cause of the death of plaintiff's sheep was overeating due to the fact that the concentrates were not equally distributed amongst the band of sheep and that the overeating was due to plaintiff's negligence in feeding the sheep. Plaintiff submitted proof that the feeding was done in the usual manner of feeding concentrates to sheep, and also submitted some proof as above pointed out that the death of the sheep was not due to overeating but due

to the poison of the volatile oil of mustard. Instead of over-eating plaintiff found it difficult to get the sheep to eat the pellets at all. Even after he was ordered to feed them nothing but these pellets in the way of concentrates, there was evidence that some of the pellets remained on the ground after the sheep were through eating. The most that can be claimed by defendant is that there is a conflict in the evidence on the question of plaintiff's negligence in feeding the sheep and hence was one for the jury.

Defendant next contends that the verdict of the jury is ▮ excessive. Its contention is that if recovery was for breach of warranty under R. C. M. 1947, sec. 74-321, the measure of damages is fixed by R. C. M. 1947, sec. 17-313, as follows: "The detriment caused by the breach of a warranty of the quality of personal property is deemed to be the excess, if any, of the value which the property would have had at the time to which the warranty referred, if it had been complied with, over its actual value at that time."

But the section applicable here is R. C. M. 1947, sec. 17-314, reading: "The detriment caused by the breach of a warranty of the fitness of an article of personal property for particular purposes is deemed to be that which is defined by the last section, together with a fair compensation for the loss incurred by an effort in good faith to use it for such purpose."

The pellets were furnished by defendant to plaintiff to be fed to plaintiff's sheep. If the jury found there was a sale of the pellets, then the measure of damages is that stated in 46 Am. Jur., Sales, sec. 801, p. 926, as follows: "The liability of the seller of an article in damages for breach of warranty includes all damages which the buyer incurred as a result of a breach of the warrnty which may fairly be supposed to have been in the contemplation of the parties at the time of the sale, that is, which might naturally be expected to follow the breach of warranty, and the buyer may, in an action for breach of warranty, recover damages for personal injuries sustained in consequence of the breach complained of, if such injuries were

in the contemplation of the parties at the time of the sale, or if they are such as might, in the natural or usual course of things, result from a breach of the warranty.''

The proper measure of damages in a case such as this was succinctly stated by the court in Doyle v. Fuerst & Kraemer, 129 La. 838, 56 So. 906, 907, 40 L. R. A., N. S., 480, as follows: ''The measure of damages in a case of this kind, where there was no actual knowledge of the vices of the things sold, but only an imputed knowledge, is not simply reimbursement of the price, as contended by defendant, but liability on the part of the seller for all the damages that were foreseen, or could easily have been foreseen, as likely to result from the putting of the thing sold to the use for which it was sold.''

There was ample evidence of the value of the sheep that died from eating the pellets to warrant the jury's verdict.

Defendant complains of the court's refusal to give its offered instructions No. 4 and No. 31. These instructions had to do with the subject of overfeeding. That subject was expressly covered by instruction No. 19 given by the court and instruction No. 15 expressly dealt with the question of contributory negligence. The court did not err in refusing to give defendant's offered instructions No. 4 and No. 31.

Defendant complains that the court refused to give its offered instruction No. 6 having to do with the doctrine of *res ipsa loquitur*. Plaintiff was not relying on that doctrine. Instructions which were given made it plain that before plaintiff could recover the burden of proof was upon it to prove the case by a preponderance of the evidence. Likewise, instruction No. 19 in part was as follows: ''The defendant is not liable merely because plaintiff's sheep became sick and died as the result of the eating of the pellets.'' The court did not err in refusing to give defendant's offered instruction No. 6.

Defendant contends that the court erred in giving instructions Nos. 3, 4, 5 and 8. All of these had to do with the question of warranty and were based upon R. C. M. 1947, sec. 74-321,

426

and were in line with our holding on the former appeal and were proper.

Other specifications of error have been considered by us but we find no reversible error in the record. The court properly denied defendant's motion for a new trial and the judgment is affirmed.

ASSOCIATE JUSTICES METCALF and FREEBOURN, concur.

MR. CHIEF JUSTICE ADAIR and MR. JUSTICE BOTTOMLY, dissent.

On Petition for Rehearing.

PER CURIAM.

Appellant's petition for rehearing is denied.

MR. CHIEF JUSTICE ADAIR, and MR. JUSTICE BOTTOMLY:

We concur in the denial of appellant's petition for rehearing herein solely because, "It is an inflexible rule that our decision on a former appeal, whether right or wrong, is binding alike on the parties and the courts in the same action." Libin v. Huffine, 124 Mont. 361, 224 Pac. (2d) 144, 146; State ex rel. Great Northern Ry. v. State Board of Equalization, 126 Mont. 187, 246 Pac. (2d) 220, 221.